**UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA, ORLANDO DIVISION**

KYLE P. TATE,

*Plaintiff*,

v.

FOX NEWS NETWORK, LLC; FOX TELEVISION STATIONS, LLC dba WOFL FOX 35 ORLANDO; OREGON TELEVISION, LLC

*Defendants*.

Case No.: 6:26-cv-01204

**DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT**

Pursuant to Rule 12(b)(6) and Section 768.295, Florida Statutes, Defendants Fox News Network, LLC; Fox Television Stations, LLC d/b/a WOFL Fox 35 Orlando; and Oregon Television, LLC[1] (collectively, "Fox") ask the Court to dismiss with prejudice the First Amended Complaint (Doc. 27; the "FAC") filed by Plaintiff Kyle Tate because the pleading states no plausible claim for relief and violates Florida's anti-SLAPP statute. For these reasons, the FAC fails as a matter of law, and Fox is entitled to recover the attorneys' fees Fox incurred while defending against Tate's meritless action.

## Introduction

The City of Palm Bay Police Department ("PBPD") arrested Tate in April 2024 for approaching three children with a gun and throwing the children's

[1] Fox 35 Orlando was incorrectly sued as "Fox Television Stations, LLC d/b/a WOFL Fox 35 Orlando." Fox Television Stations, LLC does not do business as "WOFL Fox 35 Orlando." Oregon Television, LLC owns and operates the television station with call letters WOFL that is known as "FOX 35 Orlando." Doc. 1-2 at 2. In the FAC, Tate adds Oregon Television, LLC but has not dropped Fox Television Stations, LLC, which remains an improper party to this action.

belongings into the nearby woods. As recorded in PBPD's probable cause affidavit and reported by Fox based on the affidavit, the three children were fishing in a lake owned by the Stillwater Lakes Homeowners Association in Palm Bay, Florida (the "HOA"), when Tate—then the association president—walked toward the children with a firearm and stole or destroyed more than $2,000 worth of their belongings, actions that catalyzed his arrest for felony grand theft and criminal mischief. Seventeen months after Fox reported on his arrest, Tate successfully petitioned the state to expunge the documents associated with his arrest.

In a further quest to bury his reprehensible behavior and arrest, Tate now sues Fox for defamation and injunctive relief—demanding that Fox pay him damages and take down its accurate reporting of the Stillwater Lakes incident and his arrest. But neither Florida law nor the First Amendment permits Tate to use a defamation claim to punish accurate reporting by private news organizations based on events that occurred long after the publications at issue. The fact that the state expunged Tate's records more than a year *after* Fox reported on his arrest does not retroactively give rise to a claim for defamation, which must be based on facts as they existed at the time of publication.

Tate's claims fail as a matter of law for several reasons. First, most of the claims suffer from incurable threshold defects. Second, Florida's fair report privilege prohibits liability as to nine of the eleven allegedly defamatory statements because they accurately summarize information contained in the police affidavit supporting Tate's arrest. Third, the only two non-privileged statements are not

defamatory. Fourth, as Tate's own pleading and the publications make clear, Fox did not publish any allegedly defamatory statement with the requisite degree of fault because its reporters reasonably relied on credible sources. And fifth, Tate's own pleading acknowledges that multiple statements at issue are true. In short, none of the statements is actionable for multiple independent reasons. Tate's suit contravenes bedrock First Amendment principles and well-established Florida law, requiring dismissal with prejudice at the pleading stage.

## Factual Background

On April 14, 2024, PBPD arrested Tate after he confronted three children with a gun while they fished on HOA property and then threw their belongings into the woods. *See* FAC ¶ 31; Doc. 27-1 at 1–4.[2] The probable cause affidavit supporting the arrest, written by Officer Arliz Barraza and attached by Tate as an exhibit to the FAC, stated in full:

> On 04/14/2024, I[,] Ofc. Barraza #158[,] and FTO Marcum #244 responded to a suspicious incident at Stillwater Lakes. The incident occurred on the south side of the lake in the Stillwater Lakes Subdivision, belonging to the HOA, not the defendant. There were 3 juvenile[] victims that were fishing on the property. The juvenile victims stated that a man,

[2] The Court can consider documents attached to the FAC at the pleading stage. *See* Fed. R. Civ. P. 10(c). This motion also references several documents attached to the Declaration of Katherine Meeks (Doc. 19; "Meeks Decl."), which were filed alongside Fox's initial dismissal motion and may be considered by the Court without converting the motion into a motion for summary judgment. Melissa Medalie also filed a declaration in support of the initial dismissal motion (Doc. 20), but given the amended publications at issue in the FAC, a second declaration of Melissa Medalie is filed contemporaneously herewith ("Second Medalie Decl."). The Court may consider these documents at the Rule 12 stage because their authenticity is not disputed, and they are integral to the allegations in the FAC. *See Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002); *Nix v. ESPN, Inc.*, 1:18-cv-22208, 2018 WL 8802885, at *6 (S.D. Fla. Aug. 30, 2018); *Reed v. Chamblee*, No. 3:22-cv-1059, 2023 WL 6292578, at *10, n.10 (M.D. Fla. Sep. 27, 2023). To the extent Tate misdescribes these documents in the FAC, the documents control. *See Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1206 (11th Cir. 2007).

> later identified as Kyle Patrick Tate (The defendant), approached them with a firearm telling them to get off his property. Kyle willfully deprived the juveniles of their property and threw it into the woods damaging it. The property included:
>
> -Fishing reels and rods: $1900
> -Tackles boxes containing fishing lures: $150
> -Cast nets: $150
>
> In addition, Kyle took one of the juvenile's phones which remains unrecovered. (Approximately $1500)[.] Based on the above information Kyle did deprive the victims of their property by taking the cell phone, and willfully and maliciously damaged the fishing equipment (3 fishing poles, fishing tackle)[.] [H]e was placed under arrest for Criminal Mischief (above $1000) and Grand Theft. Kyle was taken into custody and later turned over to the Brevard County Jail.

Doc. 27-1 at 2. Based on the above, Tate was charged with two third-degree felonies: criminal mischief and grand theft. *Id.* FAC ¶ 32.

On May 2, 2024, at approximately 5:30 p.m. and later around 10:00 p.m., WOFL Fox 35 Orlando broadcast a story about Tate's arrest (the "2024 Broadcasts"). FAC ¶ 55; Doc. 20-3; 26 (the 10:00 p.m. broadcast); Second Medalie Decl. Ex. 1 (the 5:30 p.m. broadcast).[3] The 2024 Broadcasts explained that PBPD arrested Tate for confronting three children with a gun while they fished on HOA property and then throwing their belongings into the woods. Doc. 20-3; 26; Second Medalie Decl. Ex. 1.

That same day, defendant local television station Fox 35 Orlando published an article about Tate's arrest titled "Florida HOA president pulls gun on kids fishing on property: affidavit" (the "Local Article"). Doc 27-2. As suggested by its

[3] With the Court's permission, pursuant to a forthcoming motion for leave to conventionally file, both the 2024 (5:30 p.m.) and 2026 Broadcast, as described below, will be provided to the Court via the filing of a USB drive. *See* Doc. 26 (acknowledging the conventional filing of the 10:00 p.m. broadcast, as it appeared on WOFL's Fox 35's website).

title, the Local Article explained that, according to the affidavit, PBPD arrested Tate for confronting three children with a gun while they fished on HOA property and then throwing their belongings into the woods. *Id.* The Local Article embedded the 10:00 p.m. broadcast therein. Second Medalie Decl., ¶ 6; Doc. 20, ¶ 4, Ex. 3; D.E. 26.

Also on May 2, 2024, defendant Fox News Network, LLC published an online article about Tate's arrest titled "Florida HOA president pulls gun on 3 kids fishing at lake before throwing tackle into woods: court docs" (the "Fox News Article"). FAC ¶ 42; Doc. 21-1; 27-3. Citing "court documents," including a "court affidavit filed in Brevard County, Florida," the Fox News Article reported that Tate "was arrested last month after allegedly pulling a gun on three kids fishing at a lake in his subdivision, taking their equipment and throwing the rods, reels and tackle into the woods." FAC ¶ 44; Doc. 27-3 at 1. This May 2, 2024, online article is the only publication at issue published by Fox News Network, LLC. *See* FAC ¶¶ 9 41.

Each publication clearly identified the charges against Tate—criminal mischief and grand theft—and attributed the charges and factual allegations on which the charges were based to the police affidavit. *See* Doc. 20-2; 20-3; 21-1; 26; 27-2; 27-3; Second Medalie Decl. Ex. 1.

More than a month after publication, on June 17, 2024, the state attorney dismissed the felony charges, and Tate later petitioned the state court, pursuant to Section 943.0595, Florida Statutes, to expunge the records associated with his arrest. FAC ¶¶ 5, 63; Doc. 27-4; 27-5. On October 6, 2025, the trial court approved

Tate's petition, *see* Doc. 27-5, at 2, requiring the destruction of all public records associated with his arrest and prosecution. *See* § 943.0585(6), Fla. Stat.

On April 3, 2026, six months after the expungement order and nearly two years after Fox reported on Tate's arrest, counsel for Tate sent separate letters to Fox News Network, LLC and Fox Television Stations, LLC claiming that the Fox News Article and Local Article were defamatory and demanding that Fox remove them and publish a retraction and apology. Doc. 27-6; 27-7. Specifically, the letters demanded that Fox publish corrections stating that "the arrest was based on a false police affidavit, that the matter was not filed by the State Attorney and dismissed, and that the matter was fully expunged"—without providing any documentation or proof that the police affidavit was false or that the records were expunged. Doc. 27-6 at 2; Doc. 27-7 at 2. And the letters also demanded that Fox "update" the Local and Fox News Articles "to reflect the dismissal and expungement." *Id.*

Although a contextless screenshot of a video was appended to the letter sent to Fox Television Stations, LLC, s*ee* Doc. 27-6 at 4, Tate's pre-suit letter to that defendant did not specifically address any broadcast or allegedly defamatory statement therein. Tate did not send *any* pre-suit letter to Oregon Television Stations, LLC.

On April 10, 2026, Fox 35 Orlando broadcast an update to the 2024 Broadcasts (the "2026 Broadcast"). Second Medalie Decl. Ex. 3–4. The 2026 Broadcast explained that, following receipt of a letter from Tate's attorney, Fox 35

Orlando confirmed that the case was expunged and that no records of the suit exist. *Id.*

On April 29, 2026, Fox News Network, LLC responded to Tate's April 3 letter, stating that although Tate has no viable claims, "Fox News would be willing to append an editor's note to the article stating that, post-publication, the district attorney declined to bring charges and the court expunged the record," provided that Tate released his purported defamation claims and provided "court records that would allow Fox News to independently confirm the disposition of Mr. Tate's arrest." Doc. 19-2; *see also* FAC ¶ 70 (incorporating Fox News's letter by reference).[4] Tate responded the next day, April 30, with a copy of the arrest affidavit and demanded that Fox News pay him $1.5 million within one day or face a lawsuit. *See* Doc. 19-3; FAC ¶ 71 (incorporating Tate's letter by reference). Tate filed this lawsuit a day later, on May 1, 2026, in the Brevard County Circuit Court, and Fox removed the case to this court. *See* Doc. 1-1.

On July 29, 2026, after Fox moved to dismiss Tate's original complaint, Tate filed the FAC, lodging eight defamation claims that are substantively the same as those in his prior pleading: Counts I and IV for defamation *per se* and defamation by implication regarding the Local Article; Counts II and V for defamation *per se*

---

[4] Tate complains Fox News Network, LLC's April 29, 2026 letter did not acknowledge the 2024 Broadcast or the update to the broadcasts published by WOFL Fox 35 Orlando on April 10, 2026. FAC ¶ 70. Contrary to the allegations in the FAC, which reflect a lack of reasonable investigation by plaintiff, Fox News Network, LLC is not "responsible for" or "involved in" Fox 35 Orlando's content. *But see* FAC ¶ 10. Fox News Network, LLC does not own or operate Fox 35 Orlando or exercise control in any way, shape, or form over the content Fox 35 Orlando publishes.

and defamation by implication regarding the Fox News Article; Counts III and VI for defamation *per se* and defamation by implication regarding the 2024 Broadcasts; and Counts VII and VIII are for defamation *per se* and defamation by implication regarding the 2026 Broadcast. The eight defamation claims are based on eleven allegedly defamatory statements across the four publications, as follows:

- Local Article Statement 1: "Florida HOA president pulls gun on kids fishing on property: affidavit." FAC ¶¶ 87, 89.
- Local Article Statement 2: "[Tate was] taken to jail last month for allegedly approaching three kids with a gun." FAC ¶ 89.
- Fox News Article Statement 1: "Florida HOA president pulls gun on 3 kids fishing at lake before throwing tackle into woods: court docs." FAC ¶ 96 (quoting article headline).
- Fox News Article Statement 2: "Kyle Tate is charged with grand theft and criminal mischief." FAC ¶ 96 (quoting article subheading).
- Fox News Article Statement 3: "A Palm Bay, Florida Homeowners Association board member was arrested last month after allegedly pulling a gun on three kids fishing at a lake in his subdivision, taking their equipment and throwing the rods, reels and tackle into the woods, according to court documents." Doc. 27-3 at 1; *cf.* FAC ¶ 96 (quoting only a portion of this sentence).
- Fox News Article Statement 4: "Kyle Tate . . . was arrested after allegedly pulling a gun on three kids fishing at a lake, claiming they were on his property." FAC ¶ 96 (quoting photo caption).
- 2024 Broadcasts Statement 1: "HOA president pulls gun on kids: officials." FAC ¶ 103.[5]
- 2024 Broadcasts Statement 2: "Attorney Accused of Approaching Kids with Gun, Throwing Stuff into Woods." FAC ¶ 103.

---

[5] 2024 Broadcasts Statements 2–4 appeared in the 5:30 broadcast. The 10:00 broadcast featured only 2024 Broadcasts Statement 4. 2024 Broadcasts Statement 1 was not published within either broadcast as they were initially transmitted over the air; rather, 2024 Broadcasts Statement 1 accompanied the 5:30 broadcast as a title to the video as it appeared on WOFL Fox 35 Orlando's website. Second Medalie Decl. Ex. 2.

- 2024 Broadcasts Statement 3: "Developing Story." FAC ¶ 103.
- 2024 Broadcasts Statement 4: "Big Story." FAC ¶ 103.
- 2026 Broadcast Statement 1: "[Kyle Tate] allegedly approached three minors who were fishing at a lake at Stillwater Lakes Subdivision in Palm Bay." Second Medalie Decl. Ex. 3; *cf.* FAC ¶ 130 (quoting only a portion of this sentence).[6]

## Applicable Standards

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "A pleading that offers only "labels and conclusions" or "naked assertions, devoid of further factual enhancement" does not suffice. *Id.* (cleaned up). Where plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Defamation actions are particularly susceptible to dismissal on a Rule 12(b)(6) motion for at least two reasons. First, "unlike most litigation, in a libel suit the central event—the communication about which suit has been brought—is literally before the judge at the pleading stage." 2 Robert D. Sack, *Sack on Defamation*, § 16.2.1, at 16-3 (5th ed. 2017). Second, because defamation actions challenge speech, both the First Amendment and Florida law place "stringent

[6] For the Court's convenience, a chart of the 11 at-issue statements, as well as their respective sources and grounds for dismissal, is attached hereto as Exhibit 1.

limits upon the permissible scope of such liability." *Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6, 12 (1970).

Both federal and Florida state courts stress the important gatekeeping role courts play in quickly dismissing untenable defamation claims. *See Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016) (noting the "powerful interest in ensuring that free speech is not unduly burdened by the necessity of defending against expensive yet groundless litigation"); *Byrd v. Hustler Mag., Inc.*, 433 So. 2d 593, 595 (Fla. 4th DCA 1983) (discussing courts' "prominent function" in disposing of meritless defamation suits). The "chilling effect" on defendants' First Amendment rights renders dismissal of meritless defamation suits especially critical. *Marder v. Tegna Inc.*, No. 19-81283-civ, 2020 WL 3496447, at *3 (S.D. Fla. June 29, 2020) (quoting Stewart v. Sun Sentinel Co., 695 So. 2d 360, 363 (Fla. 4th DCA 1997)).

Moreover, Florida's anti-SLAPP statute exists to deter plaintiffs from filing meritless complaints that target the free speech rights of journalists. *See* § 768.795, Fla. Stat. To that end, the law mandates a shifting of fees if a suit fails to survive any dispositive motion in which the statute is invoked. *Id. § 768*.295(4).

**Argument**

**I. Tate's FAC Fails to State Any Defamation Claim.**

Tate fails to state a claim for defamation based on any of the challenged statements. To state a claim for defamation, Tate must plausibly allege: (1) a false and defamatory statement of and concerning him; (2) an unprivileged publication

to a third party; (3) fault on the part of Fox; and (4) damages. *Mile Marker v. Petersen Publ'g, L.L.C.*, 811 So. 2d 841, 845 (Fla. 4th DCA 2002); *Thomas v. Jack. Television, Inc.*, 699 So. 2d 800, 803–04 (Fla. 1st DCA 1997). Tate's defamation claims fail for several reasons. First, the claims suffer from several threshold defects. Second, nine of the eleven at-issue statements are shielded by the fair report privilege. Third, the only two non-privileged statements (as well as several other statements), are not defamatory as a matter of law. Fourth, Fox did not act negligently in publishing any of the at-issue statements because Fox relied on credible sources. And fifth, Tate's own pleading establishes that several of the allegedly defamatory statements are true.

**A. Tate's defamation claims suffer multiple threshold defects.**

Tate's four defamation by implication claims (Counts IV–VI, VIII) fail as a matter of law because he alleges the at-issue statements are *false*, FAC ¶¶ 87, 89, 96, 103, 130–32, yet a defamation by implication claim must be based on statements that are *true*. *See Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008). Unlike an ordinary defamation claim—which is concerned with whether a statement is false on its face—a defamation by implication claim must be based on a misleading juxtaposition of *true* facts that *imply* a false fact about the plaintiff. *Id.* at 1108. Moreover, the plaintiff must plausibly allege that the defendant intended the false implication. *Id.*

Because a statement cannot be simultaneously true and false, a plaintiff cannot maintain claims for both defamation and defamation by implication based

on the same statements. *See Jacoby v. Cable News Network, Inc.*, 537 F. Supp. 3d 1303, 1313 (M.D. Fla. 2021) (explaining that allegedly defamatory statements cannot be both true and false, requiring dismissal of concurrently pled defamation by implication claims), *aff'd*, 21-12030, 2021 WL 5858569 (11th Cir. Dec. 10, 2021).

Moreover, the four claims for defamation by implication also fail under Florida's single-action rule because they impermissibly duplicate Tate's primary defamation claims, based on the same allegedly defamatory publications. *See Kinsman v. Winston*, No. 6:15-cv-696, 2015 WL 12839267, at *5 (M.D. Fla. Sep. 15, 2015) ("When claims are based on analogous underlying facts and the causes of action are intended to compensate for the same alleged harm, a plaintiff may not proceed on multiple counts for what is essentially the same defamatory publication or event") (brackets omitted).

In addition, both defamation claims as to the 2024 Broadcasts (Counts III and VI) are procedurally barred because Tate failed to provide statutorily compliant pre-suit notice for any broadcast. Section 770.01, Florida Statutes, requires that, at least five days before suing a media defendant, a would-be defamation plaintiff must provide notice "specifying the article or broadcast and the statements therein which he or she alleges to be false and defamatory." § 770.01, Fla. Stat.; *Nelson v. Associated Press, Inc.*, 667 F. Supp. 1468, 1474 (S.D. Fla. 1987).

Although Tate's April 3, 2026 letter addressed to Fox Television Stations LLC featured a screenshot of the 10:00 p.m. broadcast from May 2, 2024 that

accompanied the Local Article, *see* Doc. 27-6 at 4, the letter itself specified neither any particular broadcast nor any allegedly defamatory statements featured therein, in plain violation of Section 770.01. And because Florida's two-year statute of limitations as to the 2024 Broadcasts has now expired, dismissal with prejudice regarding both 2024 Broadcasts is required. *See Canonico v. Callaway*, 26 So. 3d 53, 55 (Fla. 2d DCA 2010). And for a similar reason, *any* claim specifically directed at Defendant Oregon Television, LLC must be dismissed because Oregon Television, LLC did not receive any notice at all from Tate until July 20, 2026, well after the statute of limitations expired. *See* FAC ¶ 22.

After the above threshold defects are accounted for, the only remaining claims are Counts I, II and VII. But in any event, the same arguments for dismissal set forth below apply equally to all eight of Tate's defamation claims, including those for defamation by implication. *See, e.g.*, *Rapp*, 997 So. 2d at 1108 ("All of the protections of defamation law that are afforded to the media and private defendants are therefore extended to the tort of defamation by implication"); *Stearns Bank, N.A. v. Shiraz Invs., LLC*, 8:12-cv-313, 2012 WL 3133679, at *3 (M.D. Fla. July 31, 2012) (combining the analysis for various defamation claims); *Tobinick v. Novella*, 108 F. Supp. 3d 1299, 1309 (S.D. Fla. 2015) (applying the same defenses to various defamation-related claims). For this reason—and simplicity's sake—Fox collectively refers to all eight counts as Tate's "defamation" claim(s).

**B. All but two at-issue statements are barred by the fair report privilege.**

To survive dismissal, Tate must demonstrate that the 11 allegedly defamatory statements are unprivileged. *See Mile Marker*, 811 So. 2d at 845 (outlining the requisite elements). One of Florida's most significant privileges is the fair report privilege, which shields from liability journalists who report on the contents of government records—regardless of whether the records themselves contain falsehoods. *Rasmussen v. Collier Cnty. Publ'g Co.*, 946 So. 2d 567, 570 (Fla. 2d DCA 2006); *Woodard v. Sunbeam Television Corp.*, 616 So. 2d 501, 503 (Fla. 3d DCA 1993); *Stewart*, 695 So. 2d at 362; *Larreal v. Telemundo of Fla., LLC*, 489 F. Supp. 3d 1309, 1318 (S.D. Fla. 2020). Whether a publication is protected by the fair report privilege is a question of law to be determined at the Rule 12 stage. *Vesselov v. Harrison*, No. 24-10396, 2024 WL 4449685, at *2–3 (11th Cir. Oct. 9, 2024). The privilege exists to promote openness and transparency about the official actions of government. *Larreal*, 489 F. Supp. 3d at 1320.

The government records covered by the fair report privilege include a "wide range of government-derived sources," ranging from arrest-related records to emails written by public school teachers. *See Id.* (reporting concerning plaintiff's arrest affidavit); *Folta v. N.Y. Times Co.*, No. 1:17-cv-246, 2019 WL 1486776, at *2 (N.D. Fla. Feb. 27, 2019) (reporting concerning teacher's emails). When a challenged statement relies on a public record, the fair report privilege can be defeated only where the publication in which it appears does not provide a "reasonably accurate and fair" summary of the record or a portion thereof. *Woodard*, 616 So. 2d at 502 (citations omitted); *see also Ortega v. Post-Newsweek*

*Stations, Fla., Inc.*, 510 So. 2d 972, 977 (Fla. 3d DCA 1987) (explaining that the privilege applies to "substantially accurate" summaries of public documents).

The privilege ensures that the public and the press may discuss arrests or criminal charges at the time they occur, even if the facts supporting the arrest do not ultimately hold up at trial. In Tate's view, if arrest records are eventually expunged, then a news organization retroactively loses the right to report information in the original arrest affidavit. That is not the law. The relevant time for assessing applicability of the fair report privilege is the time of publication. *See Clark v. Clark*, 1993 WL 528464 (Fla. 4th Jud. Cir. 1993) (privilege applied where publications accurately reflected government's position at time of publication), *aff'd,* 641 So. 2d 866 (Fla. 1st DCA 1994).

The privilege ensures that journalists may report on the contents of arrest affidavits, court filings, and other government records, no matter what later developments may occur in the case. *See Martin v. Hearst Corp.*, 777 F.3d 546, 551–52 (2d Cir. 2015) (rejecting plaintiff's contention that expungement statute had any bearing on her defamation claim and explaining that "the uncontroverted fact is that [plaintiff] was arrested on August 20, 2010, and that the reports of her arrest were true at the time they were published. Neither the Erasure Statute nor any amount of wishing can undo that historical truth"). The *Martin* court surveyed nationwide case law standing for the proposition that an "expungement statute does not transmute a once-true fact into a falsehood" such that it "create[s] an Orwellian scheme whereby previously public information—long maintained in

official records—now becomes beyond the reach of public discourse on penalty of a defamation action." 777 F.3d at 551, n.6 (quoting *G.D. v. Kenny*, 15 A.3d 300, 315–17 (N.J. 2011); *Bahr v. Statesman Journal Co.*, 624 P.2d 664, 666 (Or. Ct. App. 1981); *Rzeznik v. Chief of Police of Southampton*, 373 N.E.2d 1128, 1133 (Mass. 1978). Here, the subsequent expungement of Tate's court records has no bearing on his defamation claim challenging Fox's prior publications

**1. The at-issue statements accurately reflect the affidavit.**

Nine of the eleven[7] allegedly defamatory statements are shielded by the fair report privilege because they accurately describe information contained in PBPD's affidavit—*i.e.*, that PBPD arrested Tate for approaching three children with a gun while they fished on HOA property and throwing their belongings into the woods. As the side-by-side comparison in Exhibit 1 demonstrates, nine of the challenged statements closely track the affidavit, entitling Fox to the fair report privilege.

The FAC does not identify any differences, much less material differences, between these nine challenged statements and the police affidavit—because there is none. Because Fox's reporting accurately conveyed the contents of the affidavit, the fair report privilege bars Tate's defamation claims. *See Stewart*, 695 So. 2d at 362 (finding that the privilege precluded defamation liability because "no material differences" existed between the at-issue publication and the public record upon

[7] The only non-privileged statements are 2024 Broadcasts Statements 3 and 4: "Developing Story" and "Big Story." Yet as noted in Section I(A), above, no liability can attach for these statements because no pre-suit notice was provided. And as explained below, the phrases are not statements of fact and are not defamatory as a matter of law. To the extent that "Developing Story" contains a statement of fact at all, the phrase is true.

which it was based).

**2. Tate cannot overcome the fair report privilege.**

None of Tate's allegations comes close to defeating the privilege. First, Tate asserts that the affidavit itself is "false." FAC ¶¶ 4, 33, 59, 77, 84, 89, 96, 111, 117, 121–23. But the privilege exists to protect reporting that accurately conveys the content of government records, including police affidavits, regardless of whether those records themselves contain falsehoods. Indeed, the privilege applies even when the publisher *knows* the record contains false information. *See Larreal*, 489 F. Supp. 3d at 1321–22; *Ortega*, 510 So. 2d at 976; *Jamason v. Palm Beach Newspapers, Inc.*, 450 So. 2d 1130, 1131–32 (Fla. 4th DCA 1984). If the rule were otherwise, then the privilege would provide no independent protection and would simply collapse into the inquiry of whether the publication was false. But a plaintiff must plausibly allege facts showing that a statement is both unprivileged *and* false as separate elements of his claim. *Thomas*, 699 So. 2d at 803–04.

Tate further contends that the publications imply that he committed "aggravated assault with a firearm under Fla. Stat. § 784.021 [and] improper exhibition of a firearm under Fla. Stat. § 790.10." FAC ¶¶ 32, 85, 90, 97. But that is not what any of the publications say or even imply. None of them mentions Sections 784.021 or 790.10 or the crimes of aggravated assault or improper exhibition of a firearm. To the contrary, the 2026 Broadcast does not mention a firearm at all, and the Local Article, Fox News Article, and 2024 Broadcasts correctly identify the two felonies for which Tate was arrested—grand theft and

criminal mischief—as stated in the affidavit. Doc. 20-2; 20-3; 21-1; 26; 27-2; 27-3; Second Medalie Decl. Ex. 1, 2. *See also Bongino v. Daily Beast Co.*, 477 F. Supp. 3d 1310, 1318 (S.D. Fla. 2020) (noting that a "plain reading of the article" contradicted the plaintiff's mischaracterizations of the publication).

Tate next attacks the publications for reporting an "uncorroborated juvenile-source narrative allegation" contained in the police affidavit. FAC ¶¶ 3, 77, 81, 84. To the extent Fox understands this argument, Tate appears to suggest that Fox could not report on the children's allegations, as reflected in the affidavit, because they suggest he engaged in a firearms offense when he was arrested for different crimes. *Id.* But a publisher can select and comment on any excerpt of any public record—including the officer's description of what the children reported—and need not comprehensively explain the record. *See, e.g.*, *Carson*, 790 So. 2d at 1121–22 (explaining that the privilege applies to publications concerning "any separable part" of a record even if it unfairly characterizes the record as a whole); *Jamason*, 450 So. 2d at 1133 (explaining that a newspaper can devote an entire article to an isolated portion of a public record—without any effort to present a neutral portrayal of the record—and remain within the privilege); *Folta*, 2019 WL 1486776, at *7 (same). In any event, Fox's publications accurately described the crimes with which Tate was charged. *See* Doc. 20-2; 20-3; 21-1; 26; 27-2; 27-3; Second Medalie Decl. Ex. 1–4.

The FAC also asserts that the publications "did not merely report the existence of an arrest affidavit," but instead "amplified" its contents by reporting

that he "pulled" a gun on the children. FAC ¶¶ 3, 81 . But the fair report privilege applies with full force even where the publications use "colorful language" in describing the contents of the affidavit. *See Folta*, 2019 WL 1486776, at *4. "Editorial style is expected" and has no bearing on the privilege. *See id.* at *7 ("Media defendants can add color[, and] they are not required to regurgitate the exact, precise language of their government sources"); *see also Alan v. Palm Beach Newspapers, Inc.*, 973 So. 2d 1177, 1180 (Fla. 4th DCA 2008) (explaining that publishers may report on public documents in such a way as to "catch . . . the readership's attention," at the expense of literal or technical truth). Here, the affidavit stated that Tate "approached the[ children] with a firearm telling them to get off his property," and Fox is permitted reasonable editorial license to report that he "pulled" a gun. *See Larreal*, 489 F. Supp. 3d at 1319 (explaining that "the fair report privilege is broad [and the] fair and accurate bar is a low standard").

Tate next attacks the publications for suggesting that multiple (rather than single) "officials" or "court docs" stated that he had a firearm. *See* FAC ¶¶ 42, 59, 77, 81, 96, 104, 116, 117, 122. To start, the affidavit itself names three officials—Officers Barraza and Kevin Marcum and Sgt. Alcine Phang—who were involved in arresting Tate and/or generating the arrest affidavit. *See* Doc. 27-1. The publications therefore give a substantially accurate account of the police record. The publications likewise relied on multiple "court docs"—the police affidavit and Tate's booking photo—and therefore also provide a substantially accurate account of the public record of his arrest. *See* FAC ¶¶ 46, 52, 57, 96. In any event, any minor

distinction between the singular and plural makes no difference because the privilege requires only that a publication be "substantially" correct in its summary of records. "It is not necessary that [the publication] be exact in every immaterial detail or that it conform to the precision demanded in technical or scientific reporting. It is enough that it conveys to the persons who read it a substantially correct account." *See Woodard*, 616 So. 2d at 502–03 (finding no material difference between a publication reporting that plaintiff was sentenced to *four* years for *murder* and a government record stating he was sentenced to *two* years for *attempted* murder); *see also Larreal*, 489 F. Supp. 3d at 1323 (applying the privilege to a defendant's publication suggesting that the plaintiff was arrested for drug-related charges when the records showed he was arrested only for traffic-related charges within a larger drug bust).

In sum, as to all but two allegedly defamatory statements, Fox fairly and accurately reported on the contents of a public record, fully precluding any liability and requiring dismissal with prejudice as to those privileged statements.

**C. Several statements, including the two non-privileged statements, are not defamatory.**

The only non-privileged statements are 2024 Broadcasts Statements 3 and 4 ("Developing Story" and "Big Story"). "Developing Story" and "Big Story" are not defamatory as a matter of law because they do not "expose[ Tate] to distrust, hatred, contempt, ridicule or obloquy," as required to satisfy the element of defamatory meaning. *Thomas*, 699 So. 2d at 803. They also are not defamatory because whether something is "framed" as a "developing story" or "big story"

constitute subjective opinions, and defamation requires publication of a provably false fact. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40 (1974); *Santilli v. Van Erp*, No. 8:17-cv-1797, 2018 WL 2172554, at *5–6 (M.D. Fla. Apr. 20, 2018); *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018). To the extent the phrase "developing story" contains a statement of fact at all, it is indisputably true because the 2024 Broadcasts occurred between Tate's arrest in April 2024 and the State Attorney's evident decision not to prosecute in June of that year. FAC ¶¶ 1, 5. The story was therefore "developing."

The 2026 Broadcast Statement 1 also is not defamatory because the statement that Tate merely "approached" the children, which is all the statement says, conveys no defamatory meaning at all and does not diminish Tate's reputation. *See Thomas*, 699 So. 2d at 803. The statement is also true. *See* Section I(E), *infra*.

In sum, all eleven at-issue statements are either privileged or not defamatory as a matter of law, and dismissal is appropriate.

**D. The publications were not negligent.**

The defamation claims should also be dismissed for the independent reason that Tate has not plausibly alleged the fault element of his claim, which at a minimum requires a showing of negligence. *See Gertz*, 418 U.S. at 347; *From v. Tallahassee Democrat, Inc.*, 400 So. 2d 52, 55 (Fla. 1st DCA 1981).[8] Tate attempts

[8] Fox assumes solely for purposes of this motion that negligence is the applicable fault standard and reserves the right to argue for the more stringent actual malice standard as the facts allow.

to satisfy the negligence requirement by alleging that the Fox entities learned about his arrest from "an anonymous user" who uses the pseudonym "RK_Reynolds" but failed to "investigate the source's identity, motives, or relationship to the underlying parties." FAC ¶ 61. He further asserts that Fox should have spent more time investigating because his April 14, 2024 arrest did not constitute "breaking news" when Fox reported it on May 2, 2024. *Id.* ¶ 78. Neither of these allegations suffices to show negligence because Fox obtained information about the arrest from the *most credible* source—the police affidavit. *See id.* ¶ 1 (acknowledging the Fox publications cite the police affidavit).

Courts regularly grant motions to dismiss for failure to allege negligence where, as here, the defendant based its reporting on information from reliable sources such as government agencies. *See, e.g., From*, 400 So. 2d at 58 (affirming dismissal because "[t]he article itself, a part of the complaint, can neither be actionable under a standard of actual malice or simple negligence"); *Hay v. Indep. Newspapers, Inc.*, 450 So. 2d 293, 296 (Fla. 2d DCA 1984) (affirming dismissal in part because the plaintiff did not allege facts demonstrating negligence); *Nix v. ESPN, Inc.*, 772 F. App'x 807, 813 (11th Cir. 2019) (affirming dismissal as a matter of law because the defendant acted reasonably by publishing allegedly false information obtained from a credible source).

In fact, Florida courts have explained that it would be affirmatively *un*reasonable to expect reporters to independently verify what they receive from such sources. *See Patterson v. Tribune Co.,* No. 82-12389, 9 Med. L. Rptr. 2192

(Fla. 13th Jud. Cir. Aug. 03, 1983) (granting summary judgment on lack-of-negligence grounds because the defendant received the allegedly defamatory information from the Pasco County Sheriff's Office, which is a "a reliable source of information"); *El Amin v. Miami Herald Publ'g Co.*, No. 80-19892, 9 Med. L. Rptr. 1079 (Fla. 11th Jud. Cir. Jan. 17, 1983) (granting summary judgment on lack-of-negligence grounds because the information was provided to the publisher by the Miami Police Department, "an obviously reliable source"). Tate cannot establish negligence as a matter of law.

**E. Several statements are not false.**

Finally, both Florida law and the First Amendment require the plaintiff to plausibly allege that the defendant published a false statement of fact about him. *Thomas*, 699 So. 2d at 803; *Smith*, 731 So. 2d at 705–06; *Byrd*, 433 So. 2d at 595; *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777 (1986). Here, however, it is clear from the face of the FAC that at least three statements Tate claims are false are unequivocally true. First, Tate admits that he was charged with criminal mischief and grand theft, *see* FAC ¶¶ 4, 32, which precludes liability for Fox News Article Statement 2 ("Kyle Tate is charged with grand theft and criminal mischief"). And as noted above, 2024 Broadcasts Statement 3 ("Developing Story") is also true because the 2024 Broadcasts occurred between the time Tate was arrested and when the state declined to pursue the case and expunged the records. *See* FAC ¶¶ 1, 5.

Likewise, 2026 Broadcast Statement 1 ("[Kyle Tate] allegedly approached three minors who were fishing at a lake at Stillwater Lakes Subdivision in Palm Bay") is also true because the FAC expressly admits that he approached three children "on private HOA common-area property without authorization and were being lawfully directed to depart by Plaintiff in his capacity as HOA president." FAC ¶ 133.

**II. Fox is Entitled to Anti-SLAPP Fees.**

Florida's anti-SLAPP law prohibits anyone from filing a suit (a) that is "without merit" and that targets (b) the defendant's "exercise[ of] the constitutional right of free speech in connection with a public issue," defined as any statement "made in or in connection with a television program, radio broadcast, . . . magazine article . . . news report, or other similar work." § 768.295(2)(a), (3), Fla. Stat.

The anti-SLAPP statute secures "a substantive right to immunity from abusive lawsuits that suppress First Amendment rights." *Rosenthal v. Council on Am.-Islamic Relations, Fla., Inc.*, 45 Media L. Rep. 2664, 2667 (Fla. 17th Jud. Cir. Ct. Nov. 8, 2017). Because the law conveys a "substantive" right, it applies in federal court. *See Bongino*, 477 F. Supp. 3d at 1322–24; *Gov't Emps. Ins. Co. v. Right Spinal Clinic, Inc.*, 8:20-cv-0802, 2022 WL 2466039, at *11 (M.D. Fla. July 6, 2022); *Reed v. Chamblee*, No. 3:22-cv-1059, 2024 WL 69570, at *6 (M.D. Fla. Jan. 5, 2024). If both prongs of the anti-SLAPP statute are met, the statute dictates that the court "shall" award to Fox its fees and costs. § 768.295(4), Fla. Stat.

This case meets both prongs of the statute. First, as shown above, Tate's lawsuit is "without merit," § 768.295(3), Fla. Stat., because the defamation claims have multiple threshold defects and seek to hold Fox liable for statements that are shielded by the fair report privilege, not false, not published negligently, and/or not defamatory. Second, Tate's lawsuit arises out of Fox's exercise of its "constitutional right of free speech in connection with a public issue," *id.*, because the publications each constitute a "written or oral statement that is protected under applicable law" that was "made in or in connection with" a "television program, radio broadcast, . . . magazine article . . . news report, or other similar work." § 768.295(2)(a); *see also Reed*, 2024 WL 69570, at *6; *Reed*, 2023 WL 6292578, at *1, 4–6, 9–10, 12–14, 18–19, 22; *Mac Isaac v. Twitter, Inc.*, 557 F. Supp. 3d 1251, 1261 (S.D. Fla. 2021). An award of reasonable attorneys' fees and costs is mandatory. § 768.295(4), Fla. Stat.; *Bongino v. Daily Beast Co.*, 19-cv-14472, 2021 WL 4976287, at *4 (S.D. Fla. Feb. 9, 2021), *report and recommendation adopted*, 2021 WL 4316099 (S.D. Fla. Sept. 23, 2021). Fox is therefore entitled to fees and costs.

## Conclusion

For these reasons, the complaint should be dismissed with prejudice, and Fox should be awarded its fees and costs pursuant to Florida's anti-SLAPP statute.

Dated: September 4, 2026

SHULLMAN FUGATE PLLC

***/s/ Deanna K. Shullman***
Deanna K. Shullman

Florida Bar No. 514462
2101 Vista Parkway, Suite 4006
West Palm Beach, FL 33411
(561) 429-3619
dshullman@shullmanfugate.com
Minch Minchin
Florida Bar No. 1015950
50 Laura Street, Suite 2500
Jacksonville, FL 32202
(904) 914-3070
mminchin@shullmanfugate.com

**LOCAL RULE 3.01(g) CERTIFICATION**

I HEREBY CERTIFY that on several dates in August 2026 and into September, the undersigned conferred with Mr. Tate via email and telephone about dismissal. Tate opposes the relief sought herein.

*/s/ Deanna K. Shullman*