UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

KYLE P TATE,

Plaintiff,

v. Case No.: 6:26-cv-01204-GAP-DCI

FOX NEWS NETWORK, LLC, A DELAWARE LIMITED LIABILITY COMPANY; FOX TELEVISION STATIONS, LLC, A DELAWARE LIMITED LIABILITY COMPANY; AND OREGON TELEVISION LLC,

Defendants,
_________________________________/

**ORDER**

This matter came before the Court without oral argument on Defendants' Motion to Dismiss. Doc. 35. The Court has also considered Plaintiff's Response in Opposition. Doc. 46.

**I. Background**

On May 1, 2026, Plaintiff Kyle P. Tate ("Plaintiff") filed suit against Defendants Fox News Network, LLC, Fox Television Stations, LLC, and Oregon Television, LLC ("Defendants") alleging defamation and defamation by implication, in the alternative. Doc. 1-1 at 3-36; Doc. 27. Plaintiff has been a licensed attorney in Florida since 2006 and serves as the president of the residential

homeowners' association ("HOA") in the Stillwater Lakes Subdivision ("SLS") where he resides. *See* Doc. 27, ¶¶ 27-30.

On April 14, 2024, Plaintiff was arrested by the Palm Bay Police Department ("PBPD") and charged with criminal mischief and grand theft. *Id.*, ¶¶ 31-33. His arrest stemmed from a probable cause affidavit (the "Affidavit") which stated the following:

> On 04/14/2024, I Ofc. Barraza #158 and FTO Marcum #244 responded to a suspicious incident at Stillwater Lakes. The incidence occurred on the south side of the lake in Stillwater Lakes Subdivision, belonging to the HOA, not the defendant.
>
> There were 3 juveniles' victims that were fishing on the property. The juvenile victims stated a man, later identified as Kyle Patrick Tate (The defendant), approached them with a firearm telling them to get off his property. Kyle willfully deprived the juveniles of their property and threw it into the woods, damaging it. The property included:
>
> - Fishing reels and rods: $1900
> - Tackles boxes containing fishing lures: $150
> - Cast nets: $150
>
> In addition, Kyle took one of the juvenile's phones which remains unrecovered. (Approximately $1500)
>
> Based on the above information Kyle did deprive the victims of their property by taking the cell phone, and willfully and maliciously damaged the fishing equipment (3 fishing poles, fishing tackle) he was placed under arrest for Criminal Mischief (above $1000) and Grand Theft. Kyle was taken into custody and later turned over to the Brevard County Jail.

Doc. 27-1 at 2.

On May 2, 2024, Defendants published an article reporting on the incident with the headline: "Florida HOA president pulls gun on kids fishing on property: affidavit." Doc. 27, ¶¶ 35-36. The article reported the details in the PBPD Affidavit, acknowledging that the children involved (which it identified as being aged 7, 10, and 15) did not live in the subdivision and that they were fishing on property that belonged to the HOA, not Plaintiff. *See id.*, ¶ 38. It also included quotations regarding the incident from one of the children's (the 10-year-old's) mother. *Id.*, ¶ 39; *see also* Doc. 27-2 at 2 (" 'A gun should've never been pulled on them,' said the mother of the 10-year-old-child, who asked not to be named in this article. 'It was startling. He's still super shaken up, knowing that on a daily basis we have to drive by this subdivision where this man lives.' ").

Later that day, Defendants' national network published a similar article before their local TV affiliate broadcast the story on its evening news program as a "DEVELOPING STORY" and "BIG STORY" (the "2024 Broadcast").[1] *See id.*, ¶¶ 41, 55. The broadcast displayed Plaintiff's booking photograph along with a chyron reading: "BOOKING IMAGE/ATTORNEY ACCUSED OF APPROACHING KIDS WITH GUN, THROWING STUFF INTO WOODS[.]" *Id.*, ¶ 57. Another on-screen banner, which appears only during the broadcast video embedded on the article

[1] The original article eventually included an embedded video player containing this broadcast. Doc. 27, ¶ 40.

website, read: "HOA president pulls gun on kids: officials[.]" *Id.*, ¶ 58. Some versions of this banner include the qualifier, "allegedly." *See id.*, ¶ 60.

On June 17, 2024, the state attorneys' office filed a Notice of No Information, declining to pursue charges against Plaintiff over the SLS incident. *Id.*, ¶ 62; *see also* Doc. 27-4. On October 6, 2025, Plaintiff's arrest and all associated court and arresting records were ordered expunged pursuant to Fla. Stat. § 943.0585 (which allows eligible individuals to petition a court to expunge criminal history records when charges are abandoned). Doc. 27, ¶ 63; *see also* Doc. 27-5. On April 3, 2026, Plaintiff served Defendants with statutorily-required pre-suit notice which identified his claim that their reporting was false and defamatory and demanded, among other redress, its retraction.[2] Doc. 27, ¶ 64.

In response to Plaintiff's notice, on April 10, 2026, Defendants broadcast a "STORY UPDATE" regarding Plaintiff's arrest and the SLS incident (the "2026 Broadcast"). *Id.*, 65. In this update, Defendants referred to their original reporting and noted Plaintiff's April 3rd notice letter before acknowledging that, upon further research, the case had been expunged. *Id.*, ¶ 66. They also noted that they had reached out to Plaintiff's attorney for further clarification but had received no response. *Id.* The 2026 Broadcast did not mention the words "gun" or "firearm." *Id.*,

---

[2] Plaintiff served a similar notice on Defendants for his claims regarding the 2026 Broadcast on July 20, 2026. *See* Doc. 27, ¶ 22.

¶ 67.

The FAC contends that Defendants' reporting in their published articles and in the 2024 Broadcast was inaccurate and defamatory because it repeated allegations that he was carrying a firearm despite the fact that he was not charged with any firearms-related offenses. *See, e.g., id.*, ¶42. Plaintiff argues that the only source for the firearm allegation was "a single Probable Cause Affidavit narrative attributed to the juvenile complainants and supporting no firearms charge." *Id.* He likewise insists that the 2026 Broadcast "was inadequate as a corrective publication and was itself defamatory by implication and omission" because it did not include express reporting that there were no firearms charges involved and otherwise failed to correct deficiencies he perceived. *Id.*, ¶ 67.

On May 29, 2026, Defendants removed the case to this Court based on diversity jurisdiction. Doc. 1, ¶ 6; *see* 28 U.S.C. § 1332(a). On July 8, 2026, Defendants moved to dismiss Plaintiff's Complaint, but that motion was denied as moot after Plaintiff filed his First Amended Complaint ("FAC") on July 29th. Doc. 18; Doc. 27. On September 4, 2026, Defendants filed the instant Motion to Dismiss Plaintiff's FAC for failure to state a claim. Doc. 35; *see also* Fed. R. Civ. P. 12(b)(6). This matter is ripe for adjudication.

## II. Legal Standard

In ruling on a motion to dismiss, the Court must view the complaint in the

light most favorable to the plaintiff, *see, e.g., Jackson v. Okaloosa Cnty.*, 21 F.3d 1531, 1534 (11th Cir. 1994), and must limit its consideration to the pleadings and any exhibits attached thereto. *See* Fed. R. Civ. P. 10(c); *see also GSW, Inc. v. Long Cnty.*, 999 F.2d 1508, 1510 (11th Cir. 1993). The Court will liberally construe the complaint's allegations in the Plaintiff's favor. *See Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969). However, "conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal." *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003).

In reviewing a complaint on a motion to dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(6), "courts must be mindful that the Federal Rules require only that the complaint contain 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *United States v. Baxter Int'l, Inc.*, 345 F.3d 866, 880 (11th Cir. 2003) (citing Fed. R. Civ. P. 8(a)). This is a liberal pleading requirement, one that does not require a plaintiff to plead with particularity every element of a cause of action. *Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 683 (11th Cir. 2001). However, a plaintiff's obligation to provide the grounds for his or her entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554–55 (2007). The complaint's factual allegations "must be enough to raise a right to relief above the speculative level," *id.* at 555, and cross

"the line from conceivable to plausible." *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009).

**III. Analysis**

Defendants have "a qualified privilege to report accurately on information received from government officials." *Rasmussen v. Collier Cnty. Pub. Co.*, 946 So. 2d 567, 570 (Fla. Dist. Ct. App. 2006); *see Vesselov v. Harrison*, No. 24-10396, 2024 WL 4449685, *2-*3 (11th Cir. Oct. 9, 2024) (unpublished). "The privilege extends to the publication of the contents of official documents, as long as the account is reasonably accurate and fair." *Rasmussen*, 946 So.2d at 571. A "report may be covered by the privilege even if it omits details or is not as precise as technical or scientific reporting." *Vesselov*, 2024 WL 4449685 at *2 (citing *Woodard v. Sunbeam Television Corp.*, 616 So. 2d 501, 502-03 (Fla. Dist. Ct. App. 1993)). In order words, the press may exercise "editorial discretion in what to publish." *Id.* (quoting *Turner v. Wells*, 879 F.3d 1254, 1270 (11th Cir. 2018)).

Plaintiff argues that Defendants are liable for defamation because they reported that he "pulled a gun" on three children in the 2024 Broadcast (and the associated published reporting), instead of using the Affidavit's language that he "approached them with a firearm" (despite acknowledging in the FAC that the articles *do* use those exact words in some places). *See* Doc. 46 at 1-3. He says that "[p]ointing or drawing a gun on a child" is conduct covered by aggravated assault crimes for which he was never charged. *Id.* at 2. Indeed, Plaintiff avers that

Defendants "knew th[is] difference" and deliberately reserved this terminology for the headlines and the 2024 Broadcast—presumably to attract attention (although he does not explain how their knowledge of the elements of an aggravated assault charge informed their diction).[3] *Id.*

Crucially, however, Plaintiff does not dispute (nor provide any alternative explanation for the fact) that he "approached" a 7, 10, and 15-year-old "with a firearm telling them to get off his property." Doc. 27-1 at 2. Plaintiff acknowledges that he spoke to the children and has never denied that he was holding a firearm when he did so, he simply avers that he "did not approach any child in any improper, threatening, or predatory manner." Doc. 46 at 19. But then, Defendants did not report that he did any of those things either—though the Affidavit would likely support such reporting. *See* Doc. 27-1 at 2 (describing a man approaching small children "victims" with a firearm to accuse them of trespassing while "willfully depriv[ing]" them of their property, throwing their fishing poles in the woods, and "maliciously damage[ing]" them); *see also, e.g.*, Doc. 27-2; Doc. 27-3.[4]

---

[3] This is but one of several indications that Plaintiff's brief is primarily the product of artificial intelligence. *See also* Doc. 46 at 4-5 (Plaintiff's one-paragraph "argument" about the fair report privilege is meaningless).

[4] Plaintiff's contention that young, unaccompanied children would not feel inherently threatened by a strange man approaching them with a firearm (pointed at them or not) has no basis in reality—particularly where the Affidavit describes that man as "maliciously" damaging those children's property. And the fact that the state of Florida declined to press charges against Plaintiff in no way serves as grounds to distort the undisputed facts.

Not only was Defendants' reporting unquestionably an accurate and fair account of the facts described in the Affidavit, but it was important, newsworthy information of significant value to the local community.[5] *See Rasmussen*, 946 So.2d at 571; *Woodard*, 616 So. at 502-03; Doc. 27-1; Doc. 27-2; Doc. 27-3; Doc. 42. Plaintiff's attacks on the obvious applicability of the fair report privilege echo the frivolity of his FAC.

First, the "substance or gist" of Defendants' reporting plainly "conveys essentially the same meaning" as the information reported in the Affidavit.[6] *Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1107 (Fla. 2008). Second, Plaintiff's quibble with the plurality of the words, "officials" and "court docs", is not only substantively misguided (booking photos are indeed part of the "court documents" and the involvement of more than one official supports Defendants' use of the plural), but it is ultimately irrelevant to the fact that Defendants' reporting accurately reflected the official records. *See* Doc. 46 at 7. And finally, the inclusion of quotations from the mother of the 10-year-old victim has no impact on the

---

[5] In other words, categorizing this event as a "developing" or "big" story is eminently reasonable. *See* Doc. 46 at 18-19.

[6] No amount of argument from Plaintiff can change the fact that the Affidavit goes well beyond simply listing his charges; it tells a story—a story which was accurately reported by Defendants. *Compare* Doc. 27-1 (Affidavit stating that Plaintiff "approached [3 juveniles] with a firearm telling them to get off his property") *to* Doc. 46 at 18 ("That Mr. Tate was charged with theft offenses does not make true the headlines that he pulled a gun on children.").

applicability of the privilege here—particularly where her comments simply echo the Affidavit in her own words.[7]

There is no cause to withhold application of the fair report privilege, which plainly applies to Defendants' 2024 Broadcast and reporting in this case. *See Woodard*, 616 So.2d at 502-03.

Plaintiff's theory that the 2026 Broadcast was defamatory has even less merit. According to Plaintiff's Orwellian framework, the 2026 Broadcast (which aired solely because of his legal demands) is not covered by the fair report privilege because the Affidavit and original court records are now (again, at his request) "not available to any person or entity except upon order of a court of competent jurisdiction"—*ie.* that there is no longer any official record upon which to base Defendants' reporting (or the privilege). Doc. 46 at 10. Setting this dubious contention aside, Plaintiff forgets that this Court *is* of competent jurisdiction to

[7] Unsurprisingly, Plaintiff has no legal support for his frivolous contentions. *See* Doc. 46 at 6-8. His citation to *Heekin v. CBS Broadcasting, Inc.* for the proposition that the inclusion of the mother's quotations defeated the privilege is exemplary. 789 So. 2d 355 (Fla. Dist. Ct. App. 2001), *disapproved of by Anderson v. Gannett Co., Inc.*, 994 So. 2d 1048 (Fla. 2008). Not only was this case disapproved of by the Florida Supreme Court, but the 2nd DCA only reversed the lower court's application of the fair reporting privilege because "there [wa]s nothing in the record to indicate that the trial court compared the broadcast at issue with the public records and found the broadcast to be an accurate description of the records as a matter of law." *Heekin*, 789 So. 2d at 360. The Court here already found that Defendants' reporting accurately reflects the official records. *See supra*. Moreover, it is clear that the mother's comments also accurately reflect the Affidavit—albeit with additional details (ie. the firearm with which Plaintiff approached the children was allegedly a shotgun—which Plaintiff does not contest). *See supra*. Her statement that "[a] gun should've never been pulled on them" merely echoes the Affidavit and provides additional support for the Court's earlier conclusion that Defendants' reporting was accurate. *See* Doc. 27-2 at 2.

order the divulgence of such records. *See id.* That is not necessary here, however, because the Court has already seen the Affidavit (which is presently available to anyone else via this case's public docket) and it wholly supports the accuracy of Defendants' reporting.[8] *See supra.*

Having found that Defendants' initial reporting in 2024 was covered by the fair report privilege, they had no obligation to "correct" any inaccuracies in 2026. *See supra*. However, the update they provided honored Plaintiff's request to clarify that the criminal case against him "had been expunged" and that the State Attorney's office had no record of it. Doc. 27, ¶ 66. Moreover, the (accurate) short summary they provided of their 2-year-old original reporting to preface this new information cannot support a defamation claim simply because Plaintiff had the underlying official records expunged. *See, e.g.*, Doc. 27-5. This is particularly true where the records in question obviously still exist and are presently being publicly exhibited in this record.[9] *See* Doc. 27-1.

As Defendants recognized, "[i]n [Plaintiff's] view, if arrest records are

---

[8] Moreover, Plaintiff's public posting of the Affidavit with complete disregard for its privacy in this suit further undermines the sincerity and veracity of his claims.

[9] Again, Plaintiff's frivolous argument that Defendants created "an implication" by not explaining that Plaintiff specifically was not charged with or convicted of any firearm offenses is wholly without merit. The "implications" Plaintiff complains of arise only from his decision to handle a simple matter of young children fishing where (maybe) they were not supposed to be by approaching them with a firearm, demanding they leave his property, and—at least temporarily—commandeering and "maliciously" scattering (and damaging) their property. Doc. 27-1 at 2.

eventually expunged, then a news organization retroactively loses the right to report information in the original arrest affidavit." Doc. 35 at 15. Fortunately for society, Plaintiff's framework for retrospectively punishing news outlets is not the law. The relevant time for assessing applicability of the fair report privilege is the time of publication. *Clark v. Clark*, 1993 WL 528464 (Fla. 4th Jud. Cir. 1993) (privilege applied where publications accurately reflected government's position at time of publication), *aff'd*, 641 So. 2d 866 (Fla. 1st DCA 1994)). Defendants said it succinctly: "[t]he fact that the state expunged [Plaintiff's] records more than a year after [Defendants] reported on his arrest does not retroactively give rise to a claim for defamation, which must be based on facts as they existed at the time of publication." *Id.*; Doc. 35 at 2.

Plaintiff does not like the story relayed in the Affidavit, but Defendants' reporting on it was accurate and, therefore, protected by Florida's fair report privilege. Plaintiff's success convincing the state to expunge his record a year-and-a-half later has no effect on that conclusion or subsequent, accurate precis of that story.

Because any amendment would be futile, Plaintiff's lawsuit is due to be dismissed with prejudice. *Tucker v. Resha*, 634 So. 2d 756, 758 (Fla. Dist. Ct. App. 1994) ("After the facts and circumstances of a communication are revealed, the issue of whether a privilege has been established is a question of law for the court to

decide.”).[10]

## IV. Conclusion

Accordingly, it is **ORDERED** that Defendants’ Motion to Dismiss (Doc. 35) is hereby **GRANTED**.

Plaintiff’s Motions for Extension of Time (Doc. 43) and to Amend his Complaint (Doc. 49) are hereby **DENIED as moot**.

**The Clerk is directed to close the case.**

**DONE** and **ORDERED** in Chambers, Orlando, Florida on October 13, 2026.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party

[10] The Court is in receipt of Plaintiff’s Motion to Extend the Deadline to Add Parties and to Amend his FAC for a second time, but these requests arise from arguments regarding whether Oregon Television, LLC is a proper party to this lawsuit. *See* Doc. 43; Doc. 49. The Court’s findings in the instant Order, however, have rendered that dispute moot.